UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ALI MOHAMAD MOUSSAOUI,

               Plaintiff,

– against –

BANK OF BEIRUT AND THE ARAB COUNTRIES, *also known as* BBAC BANK S.A.L., and ASSAF HOLDING COMPANY SAL,

               Defendants.

**OPINION & ORDER**

22-cv-6137 (ER)

RAMOS, D.J.:

    Ali Mohamad Moussaoui brought this action against Bank of Beirut and the Arab Countries ("BBAC") and Assaf Holding Company S.A.L. ("Assaf") (collectively, "the defendants") to recover more than $3 million in funds he deposited in BBAC and was thereafter unable to withdraw.[1]  Doc. 7; Doc. 26.  In short, Moussaoui alleges that the defendants improperly prevented him from obtaining his funds and closing his account.

    Pending before the Court is the defendants' motion to dismiss the first amended complaint ("FAC").  Doc. 39.  For the reasons set forth below, the motion is GRANTED.

## I.  BACKGROUND

### A.  Factual Background

    The following facts are based on the allegations in the FAC, Doc. 26, which the Court accepts as true for purposes of the instant motion.[2]  *See, e.g.*, *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

---

[1] Moussaoui added J.P. Morgan Chase Bank, N.A., and Citibank, N.A., as defendants in his amended complaint. Doc. 26.  However, as set forth below, these entities were then voluntarily dismissed from the suit.  Doc. 62.

[2] Courts may also consider documents attached to the complaint as exhibits, as well as documents incorporated by reference in the complaint.  *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)).  If "a document relied on in the complaint contradicts allegations in the complaint, the document, not the allegations, control, and the court need not accept the allegations in the complaint as true."  *Maury v. Ventura in Manhattan, Inc.*, 544 F. Supp. 3d 396, 400 (S.D.N.Y. 2021) (citing *Poindexter v. EMI Record Group Inc.*, No. 11 Civ. 559, 2012 WL 1027639, at *2 (S.D.N.Y. Mar. 27, 2012) (internal

        **i.**        **Moussaoui's Relationship with BBAC**

Moussaoui is a resident of Texas, and he is a citizen of both the United States and Lebanon. FAC, Doc. 26 ¶ 1; Moussaoui Decl., Doc. 49 ¶ 2. BBAC is a Lebanese commercial bank that is not licensed to conduct business anywhere in the United States. Hamadeh Decl., Doc. 43 ¶ 4. Its activities include consumer lending, issuing credit cards, corporate banking services, and trade finance services. *Id.* The bank neither operates nor solicits business in New York; however, it does maintain correspondent relationships with J.P. Morgan Chase Bank, N.A. and Citibank, N.A. in New York. *Id.*; FAC, Doc. 26 ¶ 36; 37. Those relationships, along with its other correspondent bank accounts throughout the world, facilitate transactions in foreign currencies for its customers. Hamadeh Decl., Doc. 43 ¶ 7. Assaf is a holding company that owns more than half of the issued and outstanding shares of BBAC.[3] FAC, Doc. 26 ¶ 13.

In 2012, while living in Lebanon, Moussaoui opened a fixed term savings account with BBAC—a specific category of account that paid him interest on his deposits for a fixed period of time.[4] Moussaoui Decl., Doc. 49 ¶ 5; FAC, Doc. 26 ¶¶ 80, 82; *see also* Hamadeh Decl., Doc. 43 ¶ 8.

---

quotation marks omitted). Here, the complaint relies on a number of documents that are incorporated by reference, including a banking agreement and its translations. Additionally, the Court considers the several declarations submitted by both parties and which are attached to the pleadings.

[3] According to Moussaoui, BBAC transferred a significant amount of funds to Assaf in an effort to frustrate any judgment procured against BBAC. *E.g.*, FAC, Doc. 26 ¶ 223. The parties dispute whether Assaf operates within or otherwise has connections to New York. *Compare* FAC, Doc. 26 ¶ 232 (alleging that BBAC fraudulently conveyed U.S. dollars to Assaf, which Assaf is holding in New York banks in order to frustrate future judgments) *with* Doc. 40 at 8 (stating that Assaf has no operations, connections, or assets in New York); *see also* Housamy Decl., Doc. 54 ¶¶ 4–13 (noting that Assaf does not operate in New York, does not maintain bank accounts or hold assets in New York, and has no relationship with Moussaoui, and asserting that correspondent accounts were not used to facilitate any payments from BBAC to Assaf during the period described in the complaint).

[4] As relevant here, the banking agreement—which is in Arabic—included a forum selection clause, which provided as follows according to the defendants:

> If any dispute arises from the interpretation or the execution of our agreement or any of its clauses, the Courts of Beirut shall have jurisdiction to consider and settle such dispute. This jurisdiction is in the interest of your Bank, which will have the exclusive right to refer to any other judicial authority having jurisdiction, in accordance with the jurisdiction rules set forth in the Code of Civil Procedure.

As of November 5, 2015, Moussaoui maintained a balance of more than $3,379,134 in the account. FAC, Doc. 26 ¶ 83. He alleges that between 2015 and January 1, 2019, BBAC transferred money to him using banks in New York on eighteen separate occasions, and he used New York banks to transfer money to his BBAC account in Lebanon on thirteen separate occasions. *Id.* ¶¶ 84, 85. However, BBAC maintains that Moussaoui did not initiate *any* international transfers from his account in Lebanon during that time.[5] Hamadeh Decl., Doc. 43 ¶¶ 9, 10.

On February 11, 2020, the term investment matured. FAC, Doc. 26 ¶ 86. Prior to that date, and pursuant to the terms of the account agreement, Moussaoui directed BBAC to close his account and wire the principal amount to his Chase Bank account in the United Sates through BBAC's correspondent accounts in New York. *Id.* ¶¶ 88, 89, 90. BBAC refused to close the account and failed to wire the principal as instructed by Moussaoui. *Id.* ¶¶ 91, 92. BBAC declined to do so despite Moussaoui's repeated requests over the course of one year. *Id.* ¶¶ 93, 94, 95. Without Moussaoui's consent, BBAC then rolled over the account. *Id.* ¶ 97. In other words, instead of liquidating the deposit amount, the bank renewed the deposit for another fixed term.

Over the course of the next two years, BBAC amended the terms that applied to his deposit on two occasions. First, on October 12, 2020, BBAC lowered the interest rate to 1.60%, a rate that was "unilaterally" applied by BBAC, and which Moussaoui did not agree to. *Id.*

---

Moghaizel Decl., Doc. 44 ¶ 9 (translating from Arabic Article 29 of the banking agreement). Moussaoui argues that the clause is properly translated as being permissive rather than mandatory, providing that in case of a dispute, "Beirut courts *could be competent to hear and decide thereon.*" Doc. 60-1 ¶ 29. The agreement also provided that "choosing a domicile for the purposes of correspondence does not affect in any way the jurisdiction of the Beirut courts" provided for in the agreement. Moghaizel Decl., Doc. 44 ¶ 10 (defendants translating from Arabic Article 30 of the banking agreement); Doc. 60-1 ¶ 30 (plaintiff translating from Arabic Article 30 of the banking agreement).

[5] BBAC maintains that Moussaoui deposited $390,004.98 into the account on June 11, 2015, and made an additional deposit of $600,000 on July 17, 2018. Hamadeh Decl., Doc. 43 ¶ 8. Aside from these deposits, there were no deposits or transactions other than deductions of service charges from the account, *id.*, although the account showed credits for interest earned, debits of withholding taxes, and service charges, *id.* ¶ 9. BBAC has no evidence of any New York correspondent bank account transfers relating to Moussaoui. *Id.* ¶ 10.

¶¶ 99, 100. Then on November 20, 2021, BBAC amended the terms again by lowering the interest rate to 0.10%, a rate that was again unilaterally applied BBAC, and which Moussaoui did not agree to. *Id.* ¶¶ 107, 108, 109.

Throughout this period, Moussaoui demanded that BBAC transfer or wire his funds to his Chase Bank account, but BBAC refused to do so. *Id.* ¶¶ 101–106. BBAC offered only to issue a banker's check drawn on Banque Du Liban ("BDL"), the central bank of Lebanon, *id.* ¶ 103; however, Moussaoui rejected that offer on the basis that no bank would accept a check drawn against Banque Du Liban due to its lack of funds, *id.* ¶¶ 104, 105.

### ii. The Banking Crisis in Lebanon and Parallel Litigation

Over the past several years, and specifically since October 2019, Lebanon has suffered from a volatile political and economic situation, which has impacted its banking sector. Hamadeh Decl., Doc. 43 ¶ 16. In response to the crisis, "a number of restrictive measures have been adopted," including limitations on the withdrawal of funds—especially withdrawals in foreign currency. *Id.*; *see also Daou v. BC Bank, S.A.L.*, No. 20 Civ. 4438 (DLC), 2021 WL 1338772, at *1 (S.D.N.Y. Apr. 9, 2021) (explaining that Lebanon's banks closed for a period of time in 2019 and subsequently imposed restrictions on withdrawals and transfers from Lebanese bank accounts to overseas accounts) *aff'd* 42 F.4th 120 (2d Cir. 2022).[6] Specifically, BDL has restricted withdrawals and transfers of foreign currency abroad except in limited circumstances

---

[6] The Second Circuit elaborated on the cause of the crisis in a June 2022 opinion affirming the dismissal of a case similar to Moussaoui's. *Daou v. BLC Bank, S.A.L.*, 42 F.4th 120, 126 (2d Cir. 2022). In relevant part, it stated as follows:

> In late 2019, Lebanon's financial sector began spiraling into crisis. Starting in the 1990s, the Lebanese pound ("LBP") had been pegged to the U.S. dollar, an arrangement that required a steady influx of USD into Lebanon to maintain. But in response to political unrest in 2019 that resulted in the prime minister's resignation, foreign investors began to pull out of the country, causing the influx of USD to dry up. The LBP began to plunge in value, . . . and the Lebanese banking sector tried desperately to prevent a run on the banks, first by temporarily closing the country's banks, and then by making it nearly impossible to remove large quantities of USD from the country.

*Id.*

that are specifically authorized, including payments for the import of supplies, tuition payments, and medical emergencies.  Hamadeh Decl., Doc. 43 ¶ 17.

In the midst of this crisis, Moussaoui filed an action (the "Lebanese action") in the "Next Court of First Instance" in Beirut, Lebanon, against both of the defendants, on January 11, 2022. FAC, Doc. 26 ¶ 126.  He sought damages for conversion and breach of Lebanon's banking laws. *Id.*  In that case, Moussaoui requested that the court seize the defendants' assets through precautionary attachment, *id.* ¶ 132, and the court issued an order directing Moussaoui to clarify the property owned by BBAC, *id.* ¶¶ 133, 134.  Moussaoui alleges, upon information and belief, that the defendants have accounts in New York that can be attached to satisfy any judgment against them.  *Id.* ¶ 135.  The Lebanese action is ongoing.  *Id.* ¶ 137.

### B. Procedural History

The instant complaint was initially filed under seal on July 14, 2022.  Doc. 1.  On August 16, 2022, Moussaoui filed a motion for an *ex parte* pre-judgment order of attachment.  Doc. 9. The Court held a telephonic conference the same day, Min. Entry dated Aug. 16, 2022, and denied the motion, Doc. 15.  The Court concluded that it was unclear whether Moussaoui was entitled to a money judgment from the defendants, and attachment was otherwise not necessary. Hr'g Tr., Doc. 33 at 8:11–9:11.

Thereafter, the defendants filed a letter motion requesting a pre-motion conference in advance of the instant motion to dismiss on October 19, 2022.  Doc. 18.  The Court held a conference on November 3, 2022, wherein it provided Moussaoui with the opportunity to amend the complaint and granted defendants leave to file their motion to dismiss.  Min. Entry dated Nov. 3, 2022.  Moussaoui amended the complaint on November 7, 2022, Doc. 26, and the defendants filed their motion, which was fully briefed on March 7, 2023, Doc. 60.

On April 3, 2023, Moussaoui voluntarily dismissed its claims against J.P. Morgan Chase Bank, N.A. and Citibank, N.A. with prejudice.  Doc. 62.

## II. LEGAL STANDARDS

Before the Court is the defendants' motions to dismiss the complaint for lack of jurisdiction, *forum non conveniens*, and failure to state a claim. Doc. 39.

### A. Rule 12(b)(2)

Upon motion, the Court must dismiss an action against any defendant over whom it lacks personal jurisdiction. *See* Fed. R. Civ. P. 12(b)(2). A plaintiff "opposing a motion to dismiss under Rule 12(b)(2) for lack of personal jurisdiction has the burden of establishing that the court has jurisdiction over the defendant." *BHC Interim Funding, LP v. Bracewell & Patterson, LLP*, No. 02 Civ. 4695 (LTS) (HBP), 2003 WL 21467544, at *1 (S.D.N.Y. June 25, 2003) (citing *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999)). The plaintiff "must establish the court's jurisdiction with respect to each claim asserted." *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 83 (2d Cir. 2018) (quoting *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004)).

To meet this burden, a plaintiff must plead facts sufficient for a *prima facie* showing of jurisdiction. *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001). The Court construes all of the plaintiffs' allegations as true and resolves all doubts in the plaintiffs' favor. *Casville Invs., Ltd. v. Kates*, No. 12 Civ. 6968 (RA), 2013 WL 3465816, at *3 (S.D.N.Y. July 8, 2013) (citing *Porina v. Marward Shipping Co.*, 521 F.3d 122, 126 (2d Cir. 2008); *Martinez v. Bloomberg LP*, 883 F. Supp. 2d 511, 513 (S.D.N.Y. 2012)). "However, a plaintiff may not rely on conclusory statements without any supporting facts, as such allegations would lack the factual specificity necessary to confer jurisdiction." *Art Assure Ltd., LLC v. Artmentum GmbH*, No. 14 Civ. 3756 (LGS), 2014 WL 5757545, at *2 (S.D.N.Y. Nov. 4, 2014) (internal quotation marks and citation omitted). The Court may rely on additional materials outside the pleading when ruling on 12(b)(2) motions. *John Hancock Prop. & Cas. Ins. Co. v. Universale Reinsurance Co.*, No. 91 Civ. 3644 (CES), 1992 WL 26765, at *1 n.1 (S.D.N.Y. Feb. 5, 1992); *Darby Trading Inc.*

*v. Shell Intern. Trading and Shipping Co. Ltd.*, 568 F. Supp. 2d 329, 334 (S.D.N.Y. 2008) (citations omitted).

### B. *Forum Non Conveniens*

The doctrine of *forum non conveniens* allows a court to dismiss an action "even if the court is a permissible venue with proper jurisdiction over the claim." *LaSala v. Bank of Cyprus Pub. Co. Ltd.*, 510 F. Supp. 2d 246, 254 (S.D.N.Y. 2007) (quoting *Carey v. Bayerische Hypo-und Vereinsbank AG*, 370 F.3d 234, 237 (2d Cir. 2004)). "A decision to grant or deny a motion to dismiss a cause of action under the doctrine of *forum non conveniens* lies wholly within the broad discretion of the district court." *Scottish Air Int'l, Inc. v. British Caledonian Grp., PLC*, 81 F.3d 1224, 1232 (2d Cir. 1996).

The Second Circuit has "outlined a three-step process to guide the exercise of that discretion." *Norex Petroleum Ltd. v. Access Indus., Inc.*, 416 F.3d 146, 153 (2d Cir. 2005) (citing *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 73 (2d Cir. 2001) (en banc)). First, "a court determines the degree of deference properly accorded the plaintiff's choice of forum." *Id.* Second, "it considers whether the alternative forum proposed by the defendants is adequate to adjudicate the parties' dispute." *Id.* And third, "a court balances the private and public interests implicated in the choice of forum." *Id.*

If there is a forum selection clause at issue, however, the calculus is altered because a valid[7] forum selection clause is given "controlling weight in all but the most exceptional cases." *Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 134 S.Ct. 568, 581 (2013); *see also M/S Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 10 (1972) (forum selection clauses are "prima facie valid" and should be enforced unless demonstrated to be "unreasonable" under the circumstances). In such instances, the Court must determine: (1) whether the forum selection

---

[7] In the Second Circuit, a forum selection clause is presumptively valid if it was reasonably communicated to the party resisting enforcement, is mandatory and not merely permissive, and covers the claims and parties involved in the suit. *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 383 (2d Cir. 2007). To overcome this presumption of enforceability, Plaintiff has the burden to make "a sufficiently strong showing that 'enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching.'" *Id.* at 383–84 (citing *Bremen,* 407 U.S. at 15, 92 S.Ct. 1907).

7

clause is valid, and (2) whether public interest factors nevertheless counsel against its enforcement. *Atlantic,* 134 S.Ct. at 581–82; *Midamines SPRL Ltd. v. KBC Bank NV*, No. 12 Civ. 8089 (RJS), 2014 WL 1116875 at *3 (S.D.N.Y. Mar. 18, 2014).

### C. Rule 12(b)(6)

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Christie's Int'l PLC*, 699 F.3d at 145. However, the Court is not required to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also id.* at 681 (citing *Twombly*, 550 U.S. at 551).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). More specifically, the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

The question on a motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)). "[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits." *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (internal quotation marks and citations omitted).

## III. DISCUSSION

### A. Dismissal

When the Court is confronted by a motion raising a combination of Rule 12(b) defenses, it will address the jurisdictional issues before considering whether the complaint states a claim. *See Darby Trading*, 568 F. Supp. 2d at 335 (citing *Arrowsmith v. United Press Int'l*, 320 F.2d 219, 221 (2d Cir. 1963)); *Yellow Page Sols. Inc. v. Bell Atl. Yellow Pages Co.*, No. 00-cv-5663 (MM), 2001 WL 1468168, at *3 (S.D.N.Y. Nov. 19, 2001) (citation omitted).

#### i. Rule 12(b)(2) Personal Jurisdiction

"District courts deciding a motion to dismiss for lack of personal jurisdiction engage in a two-part analysis, first determining whether there is a statutory basis for exercising personal jurisdiction and second deciding whether the exercise of jurisdiction comports with due process." *BWP Media USA Inc. v. Hollywood Fan Sites, LLC*, 69 F. Supp. 3d 342, 349–50 (S.D.N.Y. 2014) (citations omitted). In New York, the statutory bases for exercising personal jurisdiction can be found in N.Y. C.P.L.R. §§ 301 and 302. *See Taormina v. Thrifty Car Rental*, No. 16-CV-3255, 2016 WL 7392214, at *3, 5 (S.D.N.Y. Dec. 21, 2016).

In the amended complaint, Moussaoui argues that jurisdiction is proper pursuant to a *quasi in rem* theory. FAC, Doc. 26 ¶¶ 32, 33. In support of that contention, the FAC asserts that BBAC and Assaf maintain correspondent banking relationships in New York, wherein the defendants maintain U.S. dollars. *Id.* Additionally, in his opposition to the defendants' motion to dismiss, Moussaoui asserts that the complaint makes a *prima facie* showing of *in personam* jurisdiction under New York's long-arm statute as well.[8] Doc. 50 at 14.

Both of Moussaoui's arguments fail here, and the action is properly dismissed for lack of personal jurisdiction.

"In the absence of a federal statute specifically directing otherwise, and subject to limitations imposed by the United States Constitution, we look to the law of the forum state to

---

[8] This basis for personal jurisdiction was not set forth in the FAC. *See generally* FAC, Doc. 26.

9

determine whether a federal district court has personal jurisdiction over a foreign corporation." *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 624 (2d Cir. 2016).  Because "[t]he reach of New York's long-arm statute . . . does not coincide with the limits of the Due Process Clause," *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 244 (2d Cir. 2007), when the forum is in New York, we must look to that statute's specific provisions to determine whether personal jurisdiction exists as a matter of state law.

The Court first considers Moussaoui's *in personam* jurisdiction arguments.  He asserts that the Court has personal jurisdiction over the defendants under N.Y. C.P.L.R. § 302(a)(1), which confers on courts personal jurisdiction over a defendant who "transacts any business within the state or contracts anywhere to supply goods or services in the state," "[a]s to a cause of action arising from" such a transaction.  *See* Doc. 50 at 15.  "To establish personal jurisdiction under section 302(a)(1), two requirements must be met:  (1) The defendant must have transacted business within the state; and (2) the claim asserted must arise from that business activity." *Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 103 (2d Cir. 2006), citing *McGowan v. Smith*, 52 N.Y.2d 268, 273, 437 N.Y.S.2d 643, 419 N.E.2d 321 (1981).

Moussaoui has failed to make the requisite showing here.  To be sure, the FAC and the incorporated documents make clear that the defendants maintained accounts in New York, even if there were only a "relatively small number of specific correspondent transactions" stemming from those accounts, *Daou*, 42 F.4th at 129, and BBAC specifically held its correspondent accounts to facilitate the foreign transactions of its customers, Hamadeh Decl., Doc. 43 ¶ 7.  However, while the defendants maintained accounts in the state, the record does not show that the defendants consistently or systematically transacted business in New York.

Critically, moreover, the instant claims do not arise out of any *specific* transaction or business activity conducted by the defendants in New York.  *See Daou*, 42 F.4th at 130 (emphasizing that "not every conceivable connection to a New York transaction is substantial enough to confer jurisdiction").  Rather, the claims are based on broad allegations regarding correspondent banking relationships and accounts maintained by the defendants in New York.

10

*See, e.g.*, FAC, Doc. 26 ¶¶ 45, 46, 47, 48, 49, 50, 53, 54, 55, 62, 65, 66 (alleging that the defendants maintained correspondent banking relationships with New York banks and used these accounts to transact business). Beside the broad contention that these accounts were maintained to fraudulently deprive BBAC customers of their funds, the FAC fails to identify "*an alleged actual transaction* made" through these accounts that "formed part of the alleged unlawful course of conduct underlying the cause of action set out in the complaint." *Daou*, 42 F.4th at 130 (emphasis added).

      As the defendants emphasize, the Second Circuit's decision in *Daou* controls here. Doc. 51 at 9. In that opinion, the Second Circuit made clear that Lebanese commercial banks are not subject to long-arm jurisdiction on state law claims premised on wrongful refusal to release and transfer U.S. dollars to depositors outside of Lebanon. *Daou*, 42 F.45h at 131–33; *id.* at 132 ("The [complaint] . . . does not include a single allegation that any defendant used an *actual, specific transaction through a New York correspondent account* in the course of bringing about the injuries on which the claims are predicated – namely, that the [plaintiff's] USD remained in Lebanon.") (emphasis added). Moussaoui's attempts to distinguish the Second Circuit's clear pronouncement in this regard are unavailing. Indeed, as the defendants point out, the cases cited by Moussaoui involve situations wherein the harm incurred by plaintiffs was caused by the transfers themselves. Doc. 51 at 10; *e.g.*, *Dale v. Banque SCS Alliance S.A.*, No. 02 Civ. 3592, 2005 WL 2347853 (S.D.N.Y. Sept. 22, 2005) (finding that personal jurisdiction was properly established in a fraud action where specific funds were laundered through a series of wire transfers to correspondent bank accounts). Here, on the other hand, Moussaoui's inability to withdraw his funds in U.S. dollars was not caused by the defendants' possession of correspondent bank accounts in the United States; rather, the record shows that it was precipitated by the banking crisis and Lebanon's corresponding regulations within its banking sector. *See* Hamadeh Decl., Doc. 43 ¶¶ 16, 17.

      Moussaoui's efforts to compare his case to a series of terrorism financing cases wherein courts have exercised personal jurisdiction over defendant banks maintaining correspondent

11

accounts in the United States are unsuccessful for the same reasons. *See generally* Doc. 50 at 17–18. Indeed, where courts have found personal jurisdiction over defendant banks in those cases, they have concluded that the defendant banks' correspondent accounts were used to transmit money to terrorist organizations via specific, documented, and knowing transactions. *See, e.g.*, *Foley v. Union de Banques Arabes et Francaises*, No. 22 Civ. 1682 (ER), 2023 WL 4646793, at *10 (S.D.N.Y. July 20, 2023). As the Second Circuit noted in *Daou*, that is not the situation in cases like this one, where the alleged unlawful activity underlying Moussaoui's claims does not involve an identified transaction that took place through accounts maintained by the defendants. *Daou*, 42 F.4th at 131.

Moussaoui's *quasi in rem* theory also fails to persuade the Court that it can exercise jurisdiction over the defendants here. "[Q]uasi in rem jurisdiction is traditionally based on attachment or seizure of property present in the jurisdiction, not on contacts between the defendant and the State." *Shaffer v. Heitner*, 433 U.S. 186, 196 (1977). The doctrine allows the Court to establish jurisdiction over a party based upon its power over property within its territory. *Id.* at 199; *Allied Maritime, Inc. v. Descatrade SA*, 620 F.3d 70, 74 (2d Cir. 2010). The property serving as the basis for jurisdiction must be related to the plaintiff's cause of action to support jurisdiction; the presence of the property alone is not enough. *Glencore AG v. Bharat Aluminum Co. Ltd.*, No. 10 Civ. 5251 (SAS), 2010 WL 4323264, at *5 (S.D.N.Y. Nov. 1, 2010). If a defendant has property in the state, the Court must consider whether the exercise of jurisdiction offends the Due Process clause of the Fourteenth Amendment, that is, the Court must ensure that the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice. *Id.*

As set forth above, the funds in the defendants' New York accounts are not tied to the claims set out in the complaint. Aside from his broad and conclusory assertions regarding the defendants' transfers of funds to the United States, Moussaoui has failed to sufficiently show that any such funds are significantly tied to the purported harms he experienced as set forth in the FAC. *See generally* FAC, Doc. 26. Additionally, as the defendants note, the caselaw in this

District consistently sets out that *quasi in rem* jurisdiction is not proper where an order of attachment is not in place and the property at issue has not otherwise been seized. *E.g.*, *Manichaean Cap., LLC v. SourceHOV Holdings, Inc.*, No. 20 Civ. 5679 (AKH), 2021 WL 276674, at *2 (S.D.N.Y. Jan. 27, 2021) (stating that New York law permits *quasi in rem* jurisdiction over a nondomiciliary defendant where a levy upon the property of the defendant has been made pursuant to an order of attachment or a seizure); *see also Concord Line Co. v. Just Oil & Grain Pte Ltd.*, No. 08 Civ. 5035 (AKH), 2010 WL 2382414, at *2 (S.D.N.Y. June 14, 2010). Of course, there is no such order of attachment or property seizure before the Court in the instant case. *See* Doc. 15.

### ii. *Forum Non Conveniens* & Ongoing Litigation in Lebanon

Additionally, the defendants set forth compelling arguments that, even if the Court could exercise personal jurisdiction over them, this is an improper forum pursuant to the doctrine of *forum non conveniens*. As set forth above, Moussaoui's banking agreement contained a forum selection clause. At this juncture, the parties dispute whether the clause was mandatory or permissive due to the fact that the record contains several competing translations of the clause. *Compare* Moghaizel Decl., Doc. 44 ¶ 9 *with* Doc. 60-1 ¶ 29. Given this dispute, and because the Court concludes here that it cannot exercise personal jurisdiction over these defendants, it need not decide whether the clause governs here.

Nevertheless, the Court underscores that the banking agreement suggests that the parties anticipated that disputes arising from it would be litigated in Lebanon. In fact, Moussaoui initially pressed his claims in Lebanon. As set forth above, before bringing this case, Moussaoui first filed suit against the defendants in Beirut, Lebanon in January 2021, wherein he sought damages for conversion and breach of Lebanon's banking laws. FAC, Doc. 26 ¶ 126. Moussaoui's arguments in that case mirrored those that he brought here. *See* FAC, Doc. 26 ¶¶ 126–133. That litigation is ongoing. FAC, Doc. 26 ¶ 137. Accordingly, as the defendants point out, there is a strong basis to conclude that interests in international comity are hampered by permitting Moussaoui, who is not a New York resident, to pursue claims arising out of a

13

dispute centered in Lebanon—where Moussaoui is a citizen, where he opened the bank account at issue, where the defendants are located, and where the relevant conduct took place. Doc. 40 at 20.

Additionally, as the defendants underscore, Lebanon has a unique, important public policy interest in hearing this dispute due to the relationship between Moussaoui's claims and the ongoing crisis taking place there. Doc. 40 at 21. Indeed, as they note, the claims "implicate [BDL]'s authority to regulate within Lebanon's borders, including carefully maintaining the country's foreign currency resources." *Id.* at 21–22. Moussaoui's claims do not implicate New York. And as the defendants also argue, "if every foreign bank customer whose transactions pass through New York correspondent accounts of foreign banks was to litigate in New York," the courts in New York would be "swamped with litigation" having limited connection to the state. *Id.* at 22. Finally, as the Court stated in a prior hearing, Moussaoui's claims likely "require an analysis of Lebanese law," Hr'g Tr., Doc. 33 at 8:19–8:20, and the record shows that Lebanese courts are able and uniquely suited to do so, Doc. 40 at 20; Moghaizel Decl., Doc. 44 ¶¶ 17, 18, 19, 20, 21; *see also* FAC, Doc 26 ¶¶ 126–137.

### iii. Rule 12(b)(6)

Because the Court here grants the defendants' motion to dismiss for lack of personal jurisdiction, it will not address their arguments regarding whether Moussaoui's claims are otherwise sufficiently pleaded pursuant to Rule 12(b)(6). *See Darby Trading*, 568 F. Supp. 2d at 335.

### B. Plaintiff's Request for Jurisdictional Discovery

In the alternative, Moussaoui moves for leave to conduct jurisdictional discovery. Doc. 50 at 30. That request is denied. The Second Circuit has held that a plaintiff who is unable to state a *prima facie* case for jurisdiction is not entitled to jurisdictional discovery. *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 186 (2d Cir. 1998). Indeed, "[d]istrict courts in this circuit routinely reject requests for jurisdictional discovery where a plaintiff's allegations are insufficient to make out *a prima facie* case of jurisdiction." *Stutts v. De Dietrich Grp.*, 465 F. Supp. 2d 156, 169

(E.D.N.Y. 2006) (collecting cases).  The decision of whether to allow jurisdictional discovery is left to the Court's discretion.  *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 255 (2d Cir. 2007) (citing *First City, Texas-Houston, N.A. v. Rafidain Bank*, 150 F.3d 172, 175 (2d Cir. 1998)).

Having failed to make out a *prima facie* case of jurisdiction, the Court denies Moussaoui's request for jurisdictional discovery.  The record here shows that that process would expend significant efforts and would be futile.

IV.    **CONCLUSION**

For the foregoing reasons, the defendants' motion to dismiss the FAC with prejudice is GRANTED.  The Clerk of Court is respectfully directed to terminate the pending motion, Doc. 39, and close the case.

It is SO ORDERED.

Dated:    September 14, 2023
         New York, New York

Edgardo Ramos, U.S.D.J.